NOT DESIGNATED FOR PUBLICATION

No. 121,711

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

GLEN SMITH,
*Appellee*,

v.

RUSKIN MANUFACTURING
and
INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA,
*Appellants*.

MEMORANDUM OPINION

Appeal from Workers Compensation Appeals Board. Opinion filed November 13, 2020. Affirmed.

*Vincent A. Burnett* and *Brock J. Baxter*, of McDonald Tinker PA, of Wichita, for appellants.

*William L. Phalen*, of Pittsburg, for appellee.

Before ATCHESON, P.J., SCHROEDER and WARNER, JJ.

PER CURIAM: Ruskin Manufacturing (Ruskin) appeals the award by the Workers Compensation Appeals Board (the Board) granting Glen Smith additional wage loss benefits. Smith was injured in 2011 while working for Ruskin and filed a workers compensation claim. At that time the Board determined he was entitled to 68 percent work disability and had 36 percent task loss. Smith later found employment with a truss builder, Pinnacle Component Systems (Pinnacle). Smith left Pinnacle when he was unable to perform his job duties due to pain from the injuries he sustained while working

for Ruskin. Smith then filed an application for review and modification of his original award based on wage loss he suffered upon leaving Pinnacle.

The administrative law judge (ALJ) determined Smith was entitled to additional permanent partial disability based upon his wage loss given his task loss remained unchanged. The Board affirmed the ALJ's modification of Smith's award. On appeal, Ruskin argues the Board erred in finding Smith's task loss remained unchanged and the Board's decision was unsupported by the evidence and contrary to the Board's prior decisions. Upon our complete review of the record and the Board's prior decisions, we find Ruskin's argument is not persuasive. We affirm the Board's award.

FACTS

In 2011, Smith was injured while working for Ruskin. Smith filed a timely claim for workers compensation benefits and ultimately received an award for permanent partial disability. The Board determined Smith suffered 9 percent total body impairment based on injuries to his back and groin and a task loss of 36 percent. The Board's order was affirmed by another panel of this court in *Smith v. Ruskin Manufacturing*, No. 118,286, 2018 WL 5305376, at *8 (Kan. App. 2018) (unpublished opinion). The full facts relating to Smith's injuries and the prior proceedings before the Board were set forth therein.

Relevant to the issues in this appeal, conflicting evidence was presented to the Board in the prior appeal regarding how Smith's task loss should be determined. Smith's physician, Dr. George Fluter, testified Smith sustained 71 percent task loss and claimed the following work restrictions were appropriate based on Smith's injuries:

- Lifting, carrying, pushing, and pulling should be limited to 10 pounds occasionally and negligible weight frequently;

2

- Bending, stooping, crouching, twisting, and stair climbing should be restricted to an occasional basis;
- Squatting, kneeling, crawling, and climbing should also be restricted to an occasional basis; and
- Prolonged sitting, standing, or walking should be avoided, and Smith should be allowed to alternate activities and change positions periodically for comfort.

Dr. Chris Fevurly, Ruskin's evaluating physician, testified Smith suffered no task loss and required no work restrictions. The Board gave equal weight to the opinions of Dr. Fluter and Dr. Fevurly and determined Smith had a 36 percent task loss.

After Smith's termination from his employment at Ruskin, he remained unemployed except for a few odd jobs until 2015. In May 2016, Smith began working as a truss builder at Pinnacle and continued working there until March 2018. Upon leaving Pinnacle, Smith sought modification of his award based on his wage loss.

Smith testified before an ALJ at his postaward hearing, claiming he quit working at Pinnacle due to the pain caused by the injuries he sustained at Ruskin. His work restrictions at Pinnacle were not lifting over 20 pounds and not running, and Smith stated the roof trusses he built at Pinnacle weighed under 20 pounds. Smith was taking pain medication while working for Pinnacle; he was prescribed methadone and muscle relaxers. Initially, Smith took four and a half methadone pills per day. With that level of medication, Smith was able to perform his job duties at Pinnacle. In January 2018, Smith's pain management provider reduced his methadone dose to two pills per day. This increased Smith's pain level, and Smith could no longer perform his job duties at Pinnacle.

The owner of Pinnacle, Kevin Anderton, testified in a deposition. Smith's work involved assembling roof trusses, specifically, hammering truss plates and wood together

on an assembly table. Without going into great detail, Anderton generally testified Smith could perform his job duties without exceeding most of the work restrictions explained to him during his deposition. He did acknowledge Smith might occasionally exceed some of the restrictions throughout the workday. However, Anderton was unaware of any work restrictions Smith may have had at the time and did not ask Smith about it. Anderton was aware Smith had been missing work but did not know if it was due to health issues. Anderton thought Smith quit after becoming angry with another employee, but Anderton stated Smith never offered a specific reason for quitting.

Anderton's testimony was presented to the ALJ to support Ruskin's argument Smith's task loss should be modified. The ALJ found Anderton's testimony established Smith exceeded some of the restrictions recommended by Dr. Fluter. The ALJ also noted the Board reached its decision by essentially splitting the difference between Dr. Fluter's opinion of 71 percent task loss and Dr. Fevurly's opinion of no task loss. Therefore, the ALJ found it inappropriate to hold all of Dr. Fluter's recommended restrictions against Smith when the Board did not accept in full the task loss opinion accompanying those restrictions. The ALJ concluded nothing new in the record established Smith needed no work restrictions as recommended by Dr. Fevurly, nor did the evidence establish Smith needed all the work restrictions recommended by Dr. Fluter. Accordingly, the ALJ found the evidence regarding Smith's work at Pinnacle demonstrated he had neither a 71 percent nor a 0 percent task loss as suggested by the doctors' competing opinions. Rather, the ALJ found Smith's subsequent work history demonstrated the Board was correct in its original task loss finding. The ALJ concluded Smith was entitled to additional permanent partial disability based on his wage loss but Smith's task loss remained unchanged. Neither Ruskin nor Smith provided any new medical evidence at the postaward hearing.

Ruskin appealed the ALJ's postaward order to the Board, and the Board affirmed. In doing so, the Board refused to alter its original conclusion as to Smith's task loss, noting no new medical evidence had been presented. The Board found it was likely Smith

4

occasionally exceeded Dr. Fluter's restriction on lifting more than 10 pounds and was standing for most of the time he worked at Pinnacle. The Board noted Dr. Fluter's restriction was to limit "sitting, standing and walking . . . to approximately 20 minutes every hour, or to tolerance." The Board found Smith was evidently able to tolerate standing for more than 20 minutes every hour. It held: "Simply because [Smith] exceeded his restrictions in order to become gainfully employed does not render those restrictions void, invalid or no longer appropriate." The Board further indicated the testimony regarding Smith's wage loss was uncontroverted and neither party disputed the ALJ's wage loss calculations. The Board adopted the ALJ's award calculation of $14,529.33.

Additional facts are set forth as necessary herein.

ANALYSIS

Under the Kansas Workers Compensation Act, K.S.A. 44-501 et seq., our review is subject to the provisions of the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq. K.S.A. 2019 Supp. 44-556(a). The KJRA sets forth several grounds upon which an appellate court may grant relief. See K.S.A. 77-621(c). Relevant to the issues on appeal are K.S.A. 77-621(c)(4) ("the agency has erroneously interpreted or applied the law") and K.S.A. 77-621(c)(7) ("the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act").

To the extent statutory interpretation is at issue, it presents a question of law over which we have unlimited review. *Nauheim v. City of Topeka*, 309 Kan. 145, 149, 432 P.3d 647 (2019). An appellate court's review of questions of fact in a workers

compensation case is limited to whether, when reviewing the record as a whole, the Board's findings of fact are supported by substantial evidence, which is a question of law. *Casco v. Armour Swift-Eckrich*, 283 Kan. 508, 514, 154 P.3d 494 (2007). For purposes of the KJRA:

> "'[I]n light of the record as a whole' means that the adequacy of the evidence in the record before the court to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record, compiled pursuant to K.S.A. 77-620, and amendments thereto, cited by any party that supports such finding, including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact. In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review." K.S.A. 77-621(d).

When reviewing whether the Board's findings are supported by substantial competent evidence,

> "[w]e review the evidence in the light most favorable to the prevailing party and do not reweigh competing evidence or assess credibility of witnesses. Thus, we will uphold the Board's decision if it is supported by substantial evidence, even though there is other evidence in the record supporting contrary findings. [Citation omitted.]" *Saylor v. Westar Energy, Inc.*, 292 Kan. 610, 614, 256 P.3d 828 (2011).

Substantial competent evidence refers to legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion. *Geer v. Eby*, 309 Kan. 182, 190, 432 P.3d 1001 (2019). "The burden of proving the invalidity of agency action is on the party asserting invalidity." K.S.A. 77-621(a)(1).

I.     *The Board's decision is supported by substantial competent evidence.*

Ruskin argues: "The uncontroverted evidence proves Smith constantly and competently exceeded the work restrictions of Dr. Fluter; hence, the Board's decision, which rests on Dr. Fluter's task loss opinion, has been so undercut as to lack credibility." Ruskin asserts we should reverse because the Board's finding is unsupported by substantial competent evidence.

Ruskin's argument is not persuasive. The ALJ acknowledged the prior award was not based solely on Dr. Fluter's opinion and neither was the postaward. The Board's prior award did not accept Dr. Fluter's opinion of 71 percent task loss, nor did it accept Dr. Fevurly's opinion of 0 task loss. Instead, the Board essentially averaged the doctors' competing opinions and found 36 percent task loss.

Here, the Board clearly found Smith exceeded *some* of Dr. Fluter's restrictions while working for Pinnacle. Ruskin argues Smith did so by frequently standing without alternating between sitting and standing. However, as the Board noted, Dr. Fluter's opinion was Smith should avoid standing for more than 20 minutes, *or to tolerance*. The Board found Smith was evidently able to tolerate standing for periods of greater than 20 minutes and he was using pain medication. Ruskin has not addressed this finding. As such, Ruskin's argument Smith exceeded Dr. Fluter's recommendations simply by standing through much of his workday does not persuade us the initial award was wrong. Ruskin provides no evidence in the record Smith was unable to tolerate standing for longer than Dr. Fluter's *general* recommendation of 20 minutes. Moreover, Anderton testified Smith could have leaned against the assembly table or other objects in the workshop to lessen the strain of standing.

Ruskin correctly points to Anderton's testimony Smith would have had to bend, crouch, stoop, and twist his torso in order to perform his job duties at Pinnacle, contrary

7

to Dr. Fluter's recommendation. The Board noted Anderton's testimony on this point. This establishes Smith exceeded at least one of Dr. Fluter's recommendations but not all of them.

Ruskin claims "Anderton also testified Smith *regularly* had to lift over ten pounds to perform his job." (Emphasis added.) Ruskin misstates Anderton's testimony on this point. Anderton testified *some* of the wooden boards used to build the roof trusses weighed in excess of 10 pounds. However, Anderton never testified Smith actually lifted such boards, much less did so on a regular basis. Rather, Anderton testified there were generally nine other workers around the truss assembly table; if someone needed help lifting something, one of the other workers could help. Anderton testified Smith could *likely avoid* lifting anything over 10 pounds "most of the day." Anderton also testified there was not a lot of lifting involved in truss building because a machine lifted the boards onto the assembly table and the assembled trusses were taken off the assembly table with a forklift.

The Board correctly noted Anderton's testimony that *some* of the wooden boards weighed more than 10 pounds and 9 other workers worked at the assembly table. The Board also noted Anderton's testimony that while it was possible for a worker to avoid lifting boards entirely, those who did so often did not remain employed at Pinnacle for very long. The Board merely found "[i]t [was] *likely* that [Smith] lifted more than 10 pounds *occasionally*." (Emphasis added.) Contrary to Ruskin's contention, Anderton's testimony and the Board's findings do not establish Smith regularly had to lift over ten pounds.

Here, the evidence only established Smith *regularly* exceeded Dr. Fluter's restriction on bending, crouching, stooping, and twisting his torso. The evidence established Smith *occasionally* exceeded Dr. Fluter's restriction on lifting more than 10 pounds. While the evidence showed Smith regularly stood through most of the workday,

8

this did not establish Smith exceeded Dr. Fluter's recommendation because Smith could walk, stand, or sit *to tolerance*. In other words, Dr. Fluter's recommendation for how long Smith could stand was more of a guideline than a rule. See *Apodaca v. Willmore*, 306 Kan. 103, 136, 392 P.3d 529 (2017) (Stegall, J., dissenting). As the Board found, Smith was evidently able to tolerate standing for longer than Dr. Fluter's *general* recommendation of 20 minutes while using pain medication. Ruskin does not argue Smith exceeded Dr. Fluter's restriction on squatting, kneeling, crawling, and climbing. And Anderton testified Smith could avoid doing all of those things as a truss builder. In sum, there was:

- One restriction Smith *regularly* exceeded;
- One restriction Smith *occasionally* exceeded;
- One restriction Smith *never* exceeded; and
- One restriction Smith did not necessarily exceed due to Dr. Fluter's qualification of that restriction.

Contrary to Ruskin's argument, Smith did not "definitively [exceed] three of the . . . four restrictions imposed by Dr. Fluter." The evidence established Smith only regularly exceeded one restriction and occasionally exceeded another. As the Board noted, Smith was taking prescription pain medication while working for Pinnacle. Smith testified he was taking muscle relaxers and four and a half methadone pills per day when he began working for Pinnacle. With this level of pain management medication, Smith was able to perform his job duties. In January 2018, Smith's pain management provider reduced his methadone dose to two pills per day. With the reduced dosage, Smith began experiencing increased pain, was no longer able to perform his work at Pinnacle, and quit in March 2018.

In short, Smith was able to exceed *some* of Dr. Fluter's recommendations while taking a fairly large dose of prescription pain medicine. However, while taking a reduced

dose, Smith was not able to perform his work at Pinnacle due to pain. This evidence amply supports the Board's conclusion that "[s]imply because [Smith] exceeded [Dr. Fluter's] restrictions in order to become gainfully employed does not render those restrictions void, invalid or no longer appropriate."

As the ALJ pointed out, there may have been things Dr. Fluter was unaware of when he recommended the work restrictions. Dr. Fluter recommended using medication for pain management. Smith received pain medication management by another provider throughout his employment at Pinnacle. Smith began working at Pinnacle in May 2016. Dr. Fluter offered his opinion in a deposition taken in December 2015. Dr. Fluter specifically stated he believed the anticonvulsant medication Gabapentin was appropriate to treat Smith's nerve dysfunction. Dr. Fluter later mentioned Smith had been receiving pain management treatment from another doctor, which included Lyrica, Ibuprofen, a muscle relaxer, and an opiod medication. Dr. Fluter did not indicate he was aware of the prescribed dosage of medication Smith was taking.

Dr. Fluter recommended work restrictions, and Smith continued receiving pain management treatment from Dr. Simon. Dr. Fluter's testimony generally established the primary basis for his recommendations was to alleviate Smith's pain and to avoid discomfort or further aggravation of Smith's injuries. However, Dr. Fluter's testimony did not establish whether those same restrictions would be necessary if Smith took a specific opiod medication—methadone—at a specific dose—four and a half pills per day. As the Board noted, no new medical evidence was presented in the postaward proceedings. Thus, there was nothing to controvert Smith's testimony he was able to do his work at Pinnacle with a higher dose of methadone but unable to tolerate the pain after his dose was significantly reduced.

Because there was no new medical evidence presented and Dr. Fluter did not specify a particular opiod medication or dosage in his deposition, there is no definitive

10

basis to determine whether Dr. Fluter's recommended work restrictions were appropriate while Smith was taking four and a half methadone pills per day between May 2016 and January 2018. Smith's testimony that his pain increased when his methadone dose was reduced supports a reasonable inference Dr. Fluter's restrictions were appropriate at the lower dose. But nothing in Dr. Fluter's testimony suggested the pain medication would *cure* Smith's injuries; rather, the purpose of the medication was to treat the symptoms, i.e., ongoing pain from the injuries. The purpose of the work restrictions was to alleviate discomfort and avoid aggravating the underlying injuries. Smith's testimony supports a reasonable inference the pain management medication simply masked his symptoms at a higher dose. This does not mean Dr. Fluter's recommended restrictions were inappropriate to avoid aggravating Smith's underlying injuries regardless of the prescribed dose or Smith's perceived pain levels.

The Board correctly determined the fact Smith exceeded Dr. Fluter's restrictions did not mean they were no longer appropriate. Quite to the contrary, the fact Smith was no longer able to work at Pinnacle given a reduced dose of pain medication strongly establishes Dr. Fluter's restrictions still remained appropriate for Smith's underlying injuries. The Board properly declined to alter its task loss determination, and its decision is supported by substantial competent evidence.

II.    *The Board's decision was not based on an error of law*.

Ruskin argues even if Dr. Fluter's opinion should not be entirely disregarded, any task restrictions Smith exceeded should be disregarded. Ruskin attempts to frame this issue as a legal argument, asserting the Board's decision is contrary to its prior decisions in *Batman v. Kansas Dept. of Transportation*, No. 1,065,493, 2017 WL 6275614 (Kan. Work. Comp. App. Bd. November 7, 2017), and *Jarrell v. Waste Management of Wichita*, No. 175,426, 1996 WL 754289 (Kan. Work. Comp. App. Bd. December 20,

11

1996). However, Ruskin's argument on this point is unpersuasive. Ruskin's briefing of this issue is really a request for us to reweigh Dr. Fluter's opinion.

*Jarrell* is readily distinguishable from the facts of this case. During a previous employment, Jarrell had permanent restrictions imposed under a workers compensation claim for an injury to her right shoulder. The prior claim was settled, and Jarrell's new employer knew of the injury. Jarrell later exceeded her prior restrictions at her new employer, incurring a second injury to her right shoulder, and she filed a new workers compensation claim. The employer argued the Board should lower her disability rating because part of her disability was attributable to her prior injury. The Board disagreed, finding it was "inappropriate to take into consideration [Jarrell's] preexisting restrictions in determining her current work disability" because Jarrell exceeded those restrictions in working for her new employer. 1996 WL 754289, at *4.

Unlike Jarrell, Smith does not claim he was injured while working for his new employer, Pinnacle. Smith's claim only relates to ongoing disability for injuries suffered at Ruskin. The Board was not attempting to resolve which impairments were attributable to multiple injuries of the same body part(s). It was clear any impairment Smith suffered was solely the result of his back and groin injuries at Ruskin. *Jarrell* is not persuasive given the highly distinguishable nature of the claims at issue therein.

*Batman* is likewise distinguishable and unpersuasive. There, Batman claimed he suffered a back injury arising out of his employment. The Board disagreed, finding Batman merely aggravated a preexisting condition stemming from injuries suffered during his prior military service. The Board considered the fact Batman exceeded the restrictions of his treating physician during his subsequent employment. However, the Board also found credible medical evidence established Batman did not require further medical treatment for his alleged injuries; therefore, he had not demonstrated entitlement to permanent disability benefits because no ongoing disability existed. The fact Batman

12

did not need further medical treatment was ultimately the determinative issue. 2017 WL 6275614, at *5-6.

The relevant points of contention in *Batman* are inapplicable here. Smith's underlying claim was already resolved by the Board. The Board determined Smith's back and groin injuries arose during his employment at Ruskin, where he suffered 36 percent task loss and required ongoing medical treatment for his injuries. The Board's order was affirmed by another panel of this court. See *Smith*, 2018 WL 5305376, at *8. Although the Board in *Batman* discussed the fact Batman exceeded his doctor's restrictions in his subsequent employment, that fact does not appear to have controlled the Board's ultimate conclusion. Rather, the fact Batman did not require ongoing treatment for his injury was fatal to his claim. 2017 WL 6275614, at *5-6.

Here, Dr. Fluter's testimony established ongoing treatment was required, including pain management medication. Smith's testimony established he was still receiving pain management treatment throughout his employment with Pinnacle. And the Board noted no new medical evidence had been presented in the postaward proceedings. *Batman* is unpersuasive as the underlying considerations in *Batman* have already been litigated in prior proceedings or are otherwise irrelevant in the present postaward proceedings. Nothing about the Board's decision here appears contrary to its decision in *Batman*. Ruskin has failed to show the Board's decision was based on an error of law.

III.     *The Board's ultimate determination was correct.*

Ruskin raises two other points in its brief. First, Ruskin argues Dr. Fevurly's opinion of zero task loss was correct and should have been accepted by the Board. Second, Ruskin asserts the Board erred in its determination of Smith's current work disability because it incorrectly determined his task loss. These points are largely interrelated, and Ruskin is incorrect on both arguments.

13

As previously discussed, the Board did not err as a matter of fact or law in adhering to its prior determination Smith suffered a 36 percent task loss. Accordingly, the Board properly rejected Dr. Fevurly's opinion claiming Smith had no task loss. Ruskin's argument regarding the Board's work disability determination is solely premised on the Board's task loss determination. Ruskin does not dispute the Board's (and the ALJ's) wage loss determination. Because Ruskin has not shown error in the Board's task loss determination and has not alleged error in the Board's wage loss determination, Ruskin fails to show error in the Board's work disability determination.

Affirmed.